**IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| v. | ) | CRIMINAL NO. 02-00058-CB |
| | | CIVIL ACTION NO. 03-0517-CB |
| MICHAEL ADAM DAVIDSON, | ) | |
| Defendant/Petitioner. | ) | |

**OPINION and ORDER**

This matter is before the Court on mandate from the United States Court of Appeals for the Eleventh Circuit vacating the Court's order denying petitioner's § 2255 motion. The appellate court held that this Court erred in its analysis of petitioner's claim of ineffective assistance of counsel in connection with his guilty plea and remanded the case for further proceedings. After an evidentiary hearing conducted on December 12, 2005, the Court concludes that the motion is due to be denied.

**Facts**

**I.  The FBI's Candyman Investigation**

   **A.  The Egroup & The Search Warrant Affidavit**

As discussed in the Court's prior § 2255 order, petitioner Michael Adam Davidson is one of a number of people nationwide who were convicted of possession or receipt of child pornography as a result of the FBI's investigation of a short-lived internet website known as "Candyman."  The following facts related to the FBI's investigation of the Candyman internet group were set forth by the Fifth Circuit in *United States v. Froman*, 355 F.3d 882 (5th Cir. 2004) and are relevant here:

   On December 6, 2000 pornographer Mark Bates ("Bates") founded an
   online club called The Candyman Group ("The Group" or "Candyman") using a

free internet service called eGroups. In general, internet groups, like those available through eGroups, allow individuals with similar interests to band together and share information through the world wide web. Members of these groups are empowered to share interests, talents, and knowledge. Candyman did not have such a benign purpose. The singular goal of the Group was to collect and distribute child pornography and sexually explicit images of children.

All Egroups are organized into different categories according to interest. Candyman was categorized as an adult, transgender, image gallery, at once suggesting its sexual content. The main web page announced to anyone considering joining the Group its purpose:

> This group is for People who love kids. You can post any type of messages you like too [sic] or any type of pics and vids you like too [sic].
> P.S. IF WE ALL WORK TOGETHER WE WILL HAVE THE BEST GROUP ON THE NET.

After reviewing the web page and learning the group's mission, anyone who wished to join the Group could do so either by clicking the subscribe link on the main web page or by sending an e-mail to the group administrator. Those subscribing via the website subscribe link were presented with e-mail delivery options allowing them to choose whether to receive all e-mails addressed to the group as a whole, receive a daily digest of e-mails addressed to the group, or to receive no e-mails and simply review the messages on the website where they are archived. Members who joined via e-mail were sent a confirmation e-mail welcoming the new member to the group but would not necessarily be presented with e-mail delivery options. Subscription to Candyman was free of charge, and simple directions for revoking membership were provided at the bottom of all correspondence. Additionally, both a link and an e-mail address on the Group's main web page could be used to cancel membership.

Once a new member subscribed, he had full access to the website and all of its functions. Members could post electronic pictures and video clips to the website for other members to access and download. They could use the chat feature to converse with each other in real time. Members could use the group to disperse images, videos and text via e-mail. Each message addressed to the group was sent to all members who requested e-mail delivery and was also stored on the website for members to review at their convenience. E-mails were also sent by the Group to members notifying them of new files that had been posted to the site and at times giving a brief description of the pornography. A poll page was included on the website that allowed group members to vote on matters important to them. Candyman members voted on the types of images they preferred: "What you all like to see more boys or girls and whats age and more actions or more soft pics pick as many as need. [sic]." Finally, a "links" page provided links to other webpages and other online groups that supplied child pornography.

\*     \*     \*     \*

The investigation of the Candyman Group began in early January 2001, when Special Agent Geoffrey Binney ("Agent Binney"), acting undercover, joined the Group. After subscribing, Binney began receiving all of the e-mails that were addressed to the Group by other members, many of which contained child pornography. From the time Agent Binney joined until the Group was shut down, he received almost 500 e-mails, containing almost 300 images of child pornography or child erotica. Agent Binney further monitored the files uploaded to the website, and captured approximately 100 illegal images and video clips.

In mid January 2001, Agent Binney contacted Yahoo!, identified himself as an FBI agent, and probed for information on the group and its members. The representative from Yahoo! refused to answer Agent Binney's questions. Given the fruitless inquiries on January 19, 2001, Agent Binney obtained a subpoena directing Yahoo! to divulge any identifying information regarding members. Yahoo! responded to the subpoena on February 6, 2001. It shut down the site and provided Agent Binney with a list of approximately 3400 e-mail addresses of individuals who were Group members when Candyman was shut down. The list provided no indication that e-mail delivery options were available to members.

Agent Binney and the FBI sorted the 3400 e-mail addresses in the member list by e-mail address providers, and sent grand jury subpoenas to those providers, requesting Group members' names, addresses, phone numbers, and any other identifying information. Once the FBI obtained addresses from service providers, Group members were assigned to local FBI offices for further investigation. Agent Binney provided local offices with template search warrant affidavits which contained all of the basic information that had been collected in the investigation. Local agents could simply fill the gaps in the affidavit with the suspect specific information and present that affidavit to a magistrate to obtain a warrant.

*Id.* at 885-86 (footnotes omitted).

### B.  Problems with the Template Search Warrant Affidavit

In May 2002, after numerous searches and arrests based on the template affidavit provided by Agent Binney, the government learned that an important allegation in the search warrant affidavits might not be true.  The affidavit alleged that "[e]very email sent to the group was sent to every member [of the Candyman Group] automatically" when, in fact, group members who joined via the website were given the option to decline the automatic email

feature.  In June 2002, the government confirmed that the "no email" option existed, so that all members of the group did not necessarily get all emails.  The import of this information was that the pictures and videos of child pornography received by Agent Binney while he was a member of the group were not necessarily emailed to every member of the group.  Nonetheless, all members of the group had access to the pictures and videos on the group's website.

In various proceedings after the existence of the "no email" option was discovered, including *United States v. Strauser* in the Eastern District of Missouri, Agent Binney testified that he joined the Candyman Group via email, rather than the website, and therefore, would not have seen the "no email" option when he joined.  After Binney's testimony in *Strauser* and before petitioner plead guilty, the FBI, through its own internal investigation, discovered that Yahoo records contradicted Agent Binney's claim that he joined via email.  According to computer source codes located at Yahoo headquarters, the email account assigned to Binney subscribed via the Candyman website and, therefore, would have been confronted with the "no email" option.

## II.  The Investigation and Arrest of Petitioner Michael Adam Davidson

The search warrant affidavit in this case, which was signed by Special Agent Tracy Lollis and is based on the template affidavit provided by Agent Binney, contained the misstatement regarding the automatic email feature, *i.e.*, that "all new members of the Egroup were immediately added to the Candyman e-mail list[ ]" and that "[e]very e-mail sent to the group was distributed to every member automatically."  But the affidavit also contained extensive information about the nature and purpose of the Candyman website, in general.  For instance, the affidavit stated:

4

**Website Features**: The Candyman website had several different features.  First, the "Files" section provided an area for members to post images or video files for others to download. . . .  The "Polls"section allowed the group members to engage in survey activity, e.g., asking "what age group do you prefer?"  The "Links" section allowed members to post the URL's for new websites containing similar content.  Lastly, the "Chat" section allowed users to engage in real-time conversations among themselves.

**Images Posted on the Website**: The primary feature of the Candyman Egroup's website was the "Files" section.  This allowed members to upload and download images directly to and from the website.  SA Binney was a member of the Egroup from January 2, 2001 until February 6, 2001 when Yahoo! closed down the Egroup.  During that time, SA Binney captured approximately 100 images and video clips [containing child pornography] that had been uploaded to the website.

Furthermore, the affidavit related the purpose of the group, as stated on the website's main page (also quoted in *Froman*, *supra* p. 2), that the site is for people who "love kids" to post "any type" of pictures or videos they like.

With respect to the petitioner, Michael Adam Davidson, the search warrant affidavit alleges that Yahoo's records revealed the email address looptone@aol.com was listed as a member of the Candyman egroup and that the email address belonged to Michael Adam Davidson, at the street address listed on the search warrant.  According to the affidavit, looptone@aol.com (Davidson's email address) subscribed and unsubscribed to the Candyman Group six times between January 22, 2001 and February 2, 2001.

In addition to the information about the Candyman website and petitioner's connection to that website, the affidavit also contained general information about the traits and characteristics of persons who collect child pornography, which was provided by Supervisory Special Agent James Clemente, an FBI behavioral analyst who specializes in "child exploitation cases." Among the observations offered by SSA Clemente: Such persons "receive sexual gratification and satisfaction from sexual fantasies fueled by depictions of children that are sexual in nature"

5

and also use child pornography as a means of understanding and justifying their feelings. These individuals tend to seek out like-minded people either in person or on the internet, in part, to rationalize or justify their own deviant behavior. And, they "rarely, if ever, dispose of their sexually explicit materials" which they "almost always maintain in . . . their homes or other secure location." (Search Warrant Aff. pp. 10-11.)

On March 19, 2002, using the search warrant affidavit described above, the local FBI office obtained a search warrant for petitioner's residence. A computer diskette containing images of child pornography was found in the residence, and petitioner was arrested.

## III. Events Leading to Petitioner's Guilty Plea

Petitioner's father retained local attorneys Richard Horne and James Dailey to represent petitioner immediately after he was arrested.[1] After a detention hearing, the magistrate judge entered an order releasing petitioner on home confinement, and petitioner returned to Illinois with his parents while awaiting trial. Upon return to Illinois, petitioner began to undergo psychiatric treatment, spending two weeks in inpatient treatment before being released to his parents' custody. Because of the treatment, petitioner's counsel requested, and obtained, a delay in the criminal proceedings.[2] Arraignment was delayed until August 7, 2002, and his trial was

---

[1]Horne and Dailey were partners at that time. Horne was lead counsel, assisted by Dailey. Mr. Horne has been in practice since 1976 and has extensive experience in the field of criminal defense. Horne testified that his practice has evolved over the years from about 95% criminal and 5% civil to 50% of each. Horne testified that he has a "fair amount" of experience in federal court as well as a "fair amount" of experience handling "white collar" cases. Horne is a member and past president of the Alabama Defense Lawyers Association. He is also a member of the National Criminal Defense Lawyers Association.

[2]Mr. Horne and Mr. Dailey erroneously believed that petitioner would receive jail credit for time served on home confinement. Therefore, they explained to petitioner that their strategy was to delay the trial as long as possible. Not until a few weeks prior to the scheduled trial date

scheduled for the October 2002 trial term with jury selection to commence on September 30, 2002.

With the goal of keeping petitioner from serving any jail time, petitioner's attorneys began to explore three possible defenses, which they discussed with petitioner and his parents in a meeting in Illinois on May 30, 2002.  The first was pleading not guilty by reason of insanity. Mr. Horne suggested the insanity defense was a possibility because petitioner had previously been diagnosed with obsessive-compulsive disorder.  Horne did not explain, however, that an insanity verdict would result in petitioner being committed to a hospital-based prison facility. The second defense under consideration was a motion to suppress the evidence obtained in the search.  The third possible defense was that the images of child pornography found in the search of petitioner's apartment were virtual, as opposed to actual, images.  Thus, when Horne and Dailey left Illinois, petitioner believed that they were preparing an insanity defense, preparing a motion to suppress and looking into a virtual-images defense.

While on pretrial release, petitioner devoted much of his time to assisting with preparation for his defense, especially the motion to suppress evidence obtained in the search.  Petitioner was much more knowledgeable than Mr. Horne about matters related to email and the internet.[3] Petitioner had been aware since the preliminary hearing that the government's information about the Candyman emails was wrong.  When Agent Lollis testified at that hearing that all members of the group received all Candyman emails, petitioner pointed out to Dailey, and later to both Dailey

---

did Mr. Horne correct this mistake.

[3]Mr. Horne testified that he rarely even used email at the time he was handling petitioner's case.

and Horne, that receipt of emails was not possible because petitioner always selected the "no

email" option when he signed up for an egroup.  On July 25, 2002, petitioner's father faxed Horne

and Dailey a copy of an article that had appeared on that date in the St. Louis Post Dispatch.  The

article reported on a St. Louis case, *United States v. Gregory Strauser*, in which the United States

had admitted, for the first time, the factual error in the Candyman template affidavit.  Counsel did

not respond to the first fax, so at petitioner's request his father faxed the article a second time on

July 28, 2002.  Eventually, Horne called petitioner about the article and told him he would

definitely be filing a motion to suppress.

Meanwhile, in a July 16, 2002 letter addressed to Jim Dailey, Assistant United States

Attorney Maria Murphy, informed defense counsel of the inaccuracy in the search warrant

affidavit regarding the automatic email feature.  The letter explained that subscribers to the

Candyman Group had the option to receive no emails.  In addition, the letter provided Agent

Binney's explanation for the misstatement, that is, that Binney never saw the "no email" option

because he joined the Group via email, where the option was not available, rather than via

website, where it was.

When petitioner came to Mobile for arraignment in early August 2002, Horne provided

him with a search warrant affidavit to review.  Petitioner returned to Illinois and thoroughly

analyzed the affidavit.[4]  On August 12, 2005, petitioner sent a counsel his analysis "so that

[Horne] [could] better understand how the factual inaccuracies in the warrant relate to Yahoo

---

[4]It turns out that the government had provided the wrong search warrant and affidavit to
defense counsel in discovery.  Consequently, petitioner reviewed an affidavit and warrant from a
Candyman investigation of another individual.  The personal information was wrong, but the
generic Candyman information was the same as contained in the affidavit used to obtain the
search warrant for petitioner's residence.

groups" and would "have a better understanding of the workings of Yahoo groups before writing

the motion to suppress."  (Petr.'s Ex. F.)  Petitioner went through the affidavit and highlighted

"the salient information in each [paragraph]" and "wr[ote] a narrative of all the factual

inaccuracies in the search warrant ."  (*Id*.)  In his analysis, petitioner pointed out repeatedly that

the affidavit was wrong when it stated that all group members automatically received Candyman

emails.  Specifically, petitioner stated that "e-mails posted to the group are NOT automatically

disseminated to all the members," that he "ALWAYS clicked on the option to not receive e-mail"

and "that this option to not receive e-mails is asked of the individual wishing to join the Yahoo

group in a plain as day fashion[;] no special searching is required."  (Petr.'s Ex. G.)

On August 15, 2002, petitioner sent Horne a follow-up letter by fax inquiring whether he

had received the foregoing analysis.  In the subsequent letter, petitioner again emphasized the

inaccuracies he found in the affidavit:

> I really would like you to read my thoughts on the search warrant, which is the
> subject matter of the package.  I believe I have a good insight into the operation of
> Egroups, and I just want to make sure that you and Jim realize all the inaccuracies
> that I saw. . . . [W]ith regard to the letter sent out by Maria Murphy in response to
> the search issue, it appears to me that they are justifying their affidavit based on
> [Binney's] not noticing that he could elect to not receive emails and that Yahoo!
> never told them about that fact either.  Perhaps this is to prove that the FBI acted
> "in good faith."  This is utter nonsense because on Egroups right after you clicked
> on "Join", a screen came up asking how you would like to deal with the emails...it
> would have been impossible not to have seen this. . . . On page 3 of Murphy's
> letter, in the notation at the bottom, they admit that, "On June 25, 2002, Yahoo!
> provided the FBI with a disk containing the records of certain CANDYMAN
> Egroup members, though not all, indicating such members had e-mail delivery
> options and the option each member chose."  Can we not have access to this
> information to prove that I was not one who elected to receive emails in order to
> bolster our case.?

(Petr.'s Ex. L.)

Petitioner was diligent in pursuing the search warrant issue with his attorneys.  Petitioner

faxed Horne and Dailey letters on August 22, August 27 and September 3.  The August 22nd letter

begins:

> Guess who is sending you yet another fax?  I hesitated, but in the end, I decided it
> is my life, after[ ] all.  I guarantee that no one has thought this search warrant thing
> through more than me.  I am no lawyer, but I do know the difference between fact
> and fiction, and I want you all to be aware of these findings.
>
>           .          .          .          .
>
> . . . [L]ets [sic] throw all of that false information out.  The new affidavit reads:
> Mr. Young joined a group called CANDYMAN at 9:23 AM on January 5, 2001.
> He clicked on the join button and was automatically allowed to be a member of the
> group.  Since he clicked on the "Read on the Web" only option, he received no
> emails from the group.  There was a file section containing child pornography, but
> Yahoo! could not provide us with information telling us if Mr. Young had
> downloaded any of those files.

(Petr.'s Ex N.)  The primary focus of the two subsequent letters is the difference between

receiving and possessing child pornography, although the letters mention the "email problem in

the [search warrant] affidavit" and the "search affidavit debacle."

Meanwhile, counsel also pursued matters related to the motion to suppress.  In a letter

dated July 30, 2002, Horne contacted St. Louis attorney Daniel Juengel,[5] who represented

Strauser in the Eastern District of Missouri, the case reported in the St. Louis Post Dispatch.

Horne enclosed a copy of the search warrant affidavit from petitioner's case and requested  copies

of the *Strauser* motion to suppress and supporting brief and also requested information about the

Yahoo representative who testified in *Strauser*. (Petr. Ex. EE.)   On August 19, 2002, Horne filed

a motion to extend the deadline for filing pretrial motions, stating that "there are two additional

pre-trial motions . . . that the defendant intends to file" including a "Motion to Suppress the

search of the residence of the defendant."  (Doc. 17.)

---

[5]Mr. Juengel now represents petitioner in the § 2255 motion *sub judice*.

Mr. Juengel responded by letter dated September 18, 2002, with copies of the relevant orders, pleadings and evidence from the *Strauser* case.  At the time, Judge Perry was the only judge to have addressed the Candyman suppression issue.   Her ruling in *Strauser* was significant in three respects.  First, she found to be false Special Agent Binney's statement that all members of the Candyman egroup automatically received emails.  Second, she found that without that statement the affidavit lacked probable cause to support the search warrant in that case.  Third, she concluded that the evidence was nonetheless admissible under the good faith exception to the exclusionary rule because Binney joined the Candyman group by email and, therefore, would not have seen the "no email" option available to those who joined via the website.[6]

Around the time of Juengle's letter, the government sent a second *Brady* letter, dated September 16, 2002, to Mr. Horne with information that contradicted the most crucial aspect of Binney's testimony before Judge Perry.  That information was this–according to Yahoo logs, made available <u>after</u> the *Strauser* ruling, Binney subscribed via web, not via email as he had testified.  Thus, Binney would have been confronted with the "no email" option and knew, or should have known, that the Candyman emails were not automatically sent to all subscribers.  Mr. Horne did not receive the letter, however, until October 9, 2002, nine days after petitioner's guilty

---

[6]At the time of the initial suppression hearing in *Strauser*, Binney's testimony that he signed up via email was not contradicted by Yahoo witnesses.  Subsequently, however, the FBI's Cyber Unit launched its own investigation into the matter and, after the FBI traveled to Yahoo headquarters and examined the source codes for Binney's subscription to the Candyman egroup, both the FBI and Yahoo concluded that Binney signed up via internet.  *United States v. Strauser*, 247 F. Supp.2d 1135, 1139 (E.D. Mo 2003).   On a motion to reconsider, decided after the petitioner pled guilty in the instant case, Judge Perry found that Binney would have been confronted with the "no email" option when he signed up for Candyman and that he acted with reckless disregard for the truth when he stated in the search warrant affidavit that all Candyman members received all emails.  She therefore granted the motion to suppress.

plea.[7]

On September 18, 2002, petitioner returned to Mobile for arraignment on a superseding indictment.  After the arraignment, Horne told petitioner that he should begin thinking about pleading guilty.  Because of the charges in the superseding indictment, petitioner's chat room transcripts were likely to be admitted into evidence, and Horne believed those transcripts would make it highly unlikely for a jury to find petitioner not guilty by reason of insanity.[8]  Petitioner was furious and asked about the motion to suppress.  Horne responded that motions to suppress were hard to win and that the Fourth Amendment had withered on the vine.  Petitioner was not ready to give up, however, without a suppression motion.  Horne told him that he would come to Illinois in a few days to talk about things.

Horne went to Illinois on September 21, 2002 to discuss  with petitioner the possibility of a guilty plea.  Horne knew that the defense in *Strauser* had won on probable cause and lost on good faith.  He did not think that petitioner had even a chance of winning a suppression motion. Petitioner, who was still focusing on the search warrant issue, asked, "Where's our motion to

---

[7]The September 16th  was addressed to Mr. Horne at "182 St. Francis Street."  Mr. Horne testified that his mailing address at that time was a post office box, not his physical office address. Horne's testimony that he did not receive the letter until after the guilty plea is bolstered by the letter itself.  (Petr.'s Ex. Q.)  The letter from Mr. Horne's files bears a "received" stamp dated October 7, 2002 from the *sender*, the United States Attorney's Office.  The letter was also date stamped as received by Horne's office on October 9, 2002.  Thus, the most logical explanation, and the Court so finds, is that the letter was first sent to Horne's street address, returned to the United States Attorney's office on October 7 and re-sent and finally received by Horne's office on October 9.

[8]On petitioner's computer, agents found saved dialogue from internet "chats" between petitioner and others.  These internet conversations included detailed discussions of torturing, mutilating and murdering children.  When some of the correspondents described how they had actually tortured and murdered children, petitioner expressed an interest in doing the same. (Presentence Investigation Report ¶ 43.)

12

suppress at?" (Tr. 72.)   Instead of a motion to suppress, Horne brought with him copies of

unfavorable rulings from the *Strauser* case.  Petitioner was very reluctant to give up on the

suppression motion.  Horne told him, however, that it was a "dead issue."  (Tr. 72.)  At that time

Horne "thought that the chances of prevailing [on a motion to suppress], given everything in the

indictment and everything in the search warrant and the affidavit, and also based on the history

[of *Strauser*][,]. . . [were] so unlikely" that it was not worth filing a motion to suppress.  (Tr. 186.)

Not only did Horne discuss the *Strauser* ruling with petitioner, he also explained to petitioner

*Franks v. Delaware* and related case law.  Horne testified:

> I discussed with him the kind of genesis starting with *Aguilar [v.] Spenelly* [sic]
> and coming forward with *Gates* and *Franks* and *Leon*, and all of those, and what I
> described as, in my opinion, how horrible the standard was in that intentional
> misrepresentations could be made, but if you backed those out and then you
> backed out those that were wrong, . . . there would still be sufficient information
> within the affidavit to carry the ball to justify the search.

(Tr. 211.)  Horne did not discuss with petitioner a conditional plea that might have allowed him to

have the suppression issue ruled on but preserved for appeal, nor did he discuss the possibility of

pleading not guilty and litigating the motion to suppress.  Following counsel's advice, petitioner

reluctantly decided to plead guilty.

    In the process of finalizing plea negotiations, AUSA Murphy sent Mr. Horne an undated

letter by fax that made reference to the September 16th *Brady* letter as follows:

> I also wanted to confirm that you had received *both* letters informing you
> of potential issues concerning S.A. Binney's affidavit for the search warrant and
> the subsequent testimony at a *Franks v. Delaware* hearing in the Eastern District of
> Missouri and a suppression hearing in the Southern District of Texas.

(Petr.'s Ex. DD, emphasis added.)  Although Mr. Horne had no independent recollection of

receiving this undated letter, he testified that it is likely he got it because he did receive another

fax from Ms. Murphy's secretary (Petr.'s Ex. FF) that appears to be a cover letter written to accompany the undated letter.[9]

On September 30, 2002, the date set for jury selection, Davidson entered a plea of guilty to Count One of the Superseding Indictment, which charged him with receipt of child pornography in violation of 18 U.S.C. § 2252A(a)(2) and (b)(1). The remaining substantive charges were dismissed as part of a plea agreement.[10]   During the guilty plea colloquy, petitioner was asked whether he was satisfied with his attorney and whether he was satisfied with his attorney's advice. Petitioner answered both questions affirmatively.

When he returned to Mobile to prepare for sentencing, petitioner found the September 16th *Brady* letter from Maria Murphy in Horne's files. Petitioner was furious with his attorneys. Mr. Horne would not discuss the letter. Instead, he insisted to the petitioner that his focus should be on sentencing.

At the sentencing hearing on January 29, 2003, petitioner was sentenced to a term of imprisonment of 33 months.[11]  The petitioner did not file an appeal. The government, however, appealed the sentence, asserting that the Court should have applied the sentencing guidelines provision applicable to trafficking in child pornography rather than the provision applicable to

_____

[9]Most likely this correspondence was faxed on September 27, 2002.

[10]Petitioner also confessed to the allegations of the two forfeiture counts and agreed to the forfeiture of certain property seized by the FBI..

[11]On April 1, 2003, the government provided petitioner's counsel with a CDRom containing 50  documents related to the Binney email issue. Those documents–which include court orders, testimony, statements, correspondence and other documents–appear to track the history of the investigation, discovery and repercussions of the false statements in Binney's template affidavit. After receiving this information, counsel filed a motion seeking to delay petitioner's incarceration, which was denied.

possession of child pornography.  The sentence was affirmed on appeal.  Petitioner has served the

sentence of imprisonment imposed upon him but remains under a supervised release term.

**II.       Procedural History/Section 2255 Motion**

Petitioner filed the instant motion to vacate, set aside or correct sentence on August 8,

2003.  This Court denied the motion without an evidentiary hearing by order dated July 20, 2004.

 Petitioner filed a notice of appeal, and this Court granted a certificate of appealability.  The

Eleventh Circuit reversed on one issue–whether petitioner's counsel rendered constitutionally

ineffective assistance of counsel in connection with the guilty plea and "his advice involving the

search warrant issues."  *Davidson v. United States*, No. 04-14325 (11th Cir. June 24, 2005) (per

curiam) (slip op.).   The opinion found that this Court had incorrectly analyzed the prejudice

prong of petitioner's claim that his guilty plea was the result of constitutionally ineffective

assistance of counsel under *Hill v. Lockhart*, 474 U.S. 52 (1985):

> . . . The district court rejected this claim based on its view that a motion to
> suppress the evidence obtained from the search would have failed under the test set
> out in *Franks v. Delaware*, 438 U.S. 154 (1978).  That is not, however, the test for
> the prejudice prong of an ineffective assistance of counsel claim relating to the
> entry of a guilty plea.  Instead, the prejudice inquiry is focused on whether, if
> counsel had not performed ineffectively, Davidson still would have pleaded guilty.
> It may be that before Davidson pleaded guilty counsel communicated to
> him all of the information counsel had (and reasonably should have had) bearing
> on the search warrant issue, and gave Davidson reasonable advice concerning that
> issue.  If counsel did that, the ineffective assistance of counsel claim fails on the
> performance prong.  However, if counsel did not perform within the wide range of
> reasonable professional assistance, under the *Hill* decision this claim will turn on
> whether Davidson would have pleaded not guilty but for the ineffective assistance.
> Both of those issues should be addressed in an evidentiary hearing.

*Davidson*, slip op. at 3-4.

**III.      Analysis**

**A.       Legal Standard--Constitutionally Ineffective Assistance of Counsel**

To establish that counsel's performance was so deficient as to violate petitioner's right to counsel guaranteed by the Sixth Amendment, petitioner "must show both incompetence and prejudice: (1) [P]etitioner must show that counsel's representation fell below an objective standard of reasonableness and (2) [P]etitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Chandler v. United States*, 218 F.3d 1305, 1312-13 (11th Cir. 2000) (en banc) (internal quotations and citations omitted). The standard for the first prong is *reasonableness* under the prevailing norms of the legal profession. *Id.* at 1313. In the context of guilty pleas, the second prong–the "prejudice" requirement– is satisfied if the petitioner "show[s] that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985).

**B. Discussion**

After carefully considering all of the evidence presented at the hearing, the Court has concluded that this case does, indeed, turn on the performance prong of the analysis.[12] In evaluating the reasonableness of counsel's performance, the question is not whether counsel did what was possible, or even what was prudent but whether he did what was "constitutionally compelled." *Chandler*, 218 F.3d at 1313. The burden of persuasion is on the petitioner to prove by a preponderance of competent evidence that counsel's performance was unreasonable. *Id.*

---

[12]Since the Court has concluded that counsel's advice was not erroneous, the question of prejudice, *i.e.*, whether petitioner would not have pled guilty but for counsel's "erroneous" advice, is moot. However, petitioner did present persuasive evidence that he strongly wished to pursue the suppression issue and only decided to abandoned that issue and plead guilty after being persuaded by counsel that a suppression motion had no chance of succeeding. If counsel's advice had been erroneous, petitioner would succeed on the prejudice prong.

16

"[T]o show that [counsel's] conduct was unreasonable, a petitioner must establish that no reasonable counsel would have taken the action that his counsel did." *Id*. at 1315. Review of counsel's performance must be highly deferential, and there is a "strong presumption" of reasonableness. *Id.* at 1314. That presumption is even stronger if petitioner was represented by experienced trial counsel. *Id.* at 1315. Nothing looks the same in hindsight; therefore, the Court must evaluate the reasonableness of counsel's performance from counsel's perspective at trial. *Id.* at 1316. No absolute rules dictate what is reasonable. *Id.* at 1317. Hence, counsel has no absolute duty to investigate particular facts or a certain line of defense. *Id.*

In this case, whether counsel's advice to plead guilty was unreasonable hinges on whether counsel unreasonably advised petitioner that a motion to suppress would not likely succeed. Counsel's legal conclusion that a suppression motion would not be fruitful must be evaluated for reasonableness under the circumstances. "Failure to file a motion to suppress does not constitute *per se* ineffective assistance of counsel. . . Defense counsel 'is not required automatically to file a suppression motion in every case involving evidence or statements obtained after a search; rather, counsel must use 'professional discretion in deciding whether there are sufficient grounds' for such a motion." *United States v. Chavez-Valencia*, 116 F.3d 127, 134 (5th Cir. 1997) (quoting *United States v. Aulet*, 618 F.2d 182, 187-88 (2d Cir. 1980). Counsel's decision whether to file a suppression motion required an analysis of the search warrant affidavit under the Supreme Court's decisions in *United States v. Leon*, 468 U.S. 897 (1984) and *Franks v. Delaware*, 438 U.S. 154. Collectively, those cases hold that evidence seized pursuant to a search warrant obtained by false statements is admissible if the false statements were made in good faith, *Leon*, at 912, but if the false statements were deliberately or recklessly made, the evidence must be

excluded *unless* the search warrant affidavit contained sufficient probable cause without the false

statements. *Franks*, at 171-72.[13]

Petitioner first contends that counsel failed to discover or appreciate the impact of

evidence that, in effect, would have led a reasonable attorney to file a motion to suppress under

*Leon*. The government's September 16th letter–informing defense counsel that Binney did not

join Candyman via email as he had testified in *Strauser*–was sufficient to put counsel on notice

that the *Leon* good faith exception did not apply. Horne did not receive the September 16th

letter;[14] however, he should have known about it. A subsequent letter (Exhibit DD) faxed to

Horne prior to the guilty plea referred to *two* previous letters from the United States Attorney

regarding Binney and the search warrant affidavit.[15] Mr. Horne only had one. For the

government to admit error in a search warrant affidavit is an exceptional circumstance; for the

government to provide *two* letters on the issue is extraordinary. Consequently, any reasonable

attorney in Mr.

 Horne's situation would have made further inquiry to find the letter he did not have and would

have discovered evidence of deliberate or reckless falsehood in the search warrant affidavit. But

the evaluation of a search warrant affidavit for possible suppression under the Fourth

---

[13]Actually, this statement of the application *Franks* and *Leon* is in reverse order, but this is the sequence in which the ineffective assistance claims have been raised. *Leon* applies only when the affidavit is found to lack probable cause, so the first question is whether the search warrant affidavit supported a finding of probable cause. *See, e.g.*, *United States v. Foree*, 43 F.3d 1572, 1575 n. 7 (11th Cir. 1995) (declining to address government's reliance on *Leon* good faith exception where affidavit supported probable cause finding)

[14]See p. 12 n. 7, *supra*.

[15]Based on Mr. Horne's testimony that he probably received Exhibit DD the Court finds by a preponderance of the evidence that Horne *did* receive Exhibit DD prior to the defendant's guilty plea.

Amendment, does not begin and end with a determination that the government lacked good faith. Even where an affidavit contains deliberate or reckless falsehoods, the evidence is admissible under *Franks* if the affidavit contains other information sufficient to support a finding of probable cause.   Thus, the reasonableness of counsel's conduct turns on his analysis of the suppression issue under *Franks*.

The *Franks* test is a demanding one because a search warrant carries a presumption of validity. *Franks* at 171.  A defendant must point the specific statements alleged to be false *and* must accompany his motion with an offer of proof. *Id.* "[I]f these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required. On the other hand, if the remaining content is insufficient, the defendant is entitled, under the Fourth and Fourteenth Amendments, to his hearing. Whether he will prevail at that hearing is, of course, another issue." *Id.* at 171-72.

Petitioner contends that Horne's analysis of the second *Franks* prong–the sufficiency of the warrant once the false statements are set aside--was deficient and amounted to ineffective assistance of counsel.  Horne, a very experienced criminal defense attorney, discussed *Franks, Leon* and other Fourth Amendment cases with petitioner and explained his belief that probable cause existed even absent the false statements.  According to petitioner, Horne's analysis was wrong, and unreasonable, because Judge Perry in Missouri–the only judge to have ruled on the Candyman affidavit at that time--had reached the opposite conclusion. Of course, one district judge's decision is not binding on another district judge, so a favorable finding in one district does not guarantee the same ruling in another district, even on similar or related facts.  Thus,

19

Horne's evaluation of petitioner's case in light of his knowledge of the judge before whom a suppression motion would be heard was not unreasonable.  Moreover, the facts are not identical.  In *Strauser*, the affidavit's only information regarding the defendant, other than the false information, was "that an email account registered to him subscribed to Candyman on December 26, 2000, and was still a member on February 6, 2001 when the site was shut down" and that the same email account had used two sexually suggestive screen names.  *Strauser*, 247 F. Supp. 2d at 1144.  In contrast, the search warrant affidavit in this case stated that the email address listed to petitioner subscribed and unsubscribed to the Candyman Group six times between January 22, 2001 and February 2, 2001.  From this, one could reasonably conclude that petitioner was not an accidental or inactive member of the email group.  From other information in the affidavit it was evident that the purpose of the group was to collect and distribute child pornography and that persons who belong to such a group were likely to store downloaded child pornography in their homes.  Considering these facts in light of the probable cause standard, a reasonable attorney who had reviewed *Strauser* and the facts of this case could have concluded that the search warrant affidavit, without the false statements, was sufficient and, therefore, a motion to suppress under *Franks* would not be successful.[16]  Under these circumstances, advising petitioner not to pursue a suppression motion and to plead guilty circumstances did not amount to ineffective assistance of counsel.

**IV.  Conclusion**

       Counsel's investigation and advice in this case fall within the wide range of conduct

---

[16]A detailed explanation of the reasons the redacted affidavit could support a finding if probable cause are discussed in detail in the Court's prior § 2255 order, Doc. 63, at 12-14.

among competent counsel that could be considered reasonable.  For that reason, petitioner's

motion to vacate, set aside or correct sentence fails.

It is, therefore, **ORDERED** that petitioner's motion to vacate, set aside or correct

sentence be and hereby is **DENIED**.

**DONE** this the 1st day of May, 2006.

*s/Charles R. Butler, Jr.*
**Senior United States District Judge**